UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

RECEIVED
JUL 29 2021
TONY R. MOORE CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT LOUISIANA

CODI DODGE,

Plaintiff,

vs.

Case No.: 6: 21-cv-2271

UNITED STATES,
DEMANDED

JURY TRIAL

Defendant.

## COMPLAINT

NOW COMES, Plaintiff, Codi Dodge ("Dodge"), acting pro-se, and pursuant to the Federal Tort Claim Act ("FTCA"), 28 U.S.C. Sections 1346(b) & 2671 et. seq., files this Complaint against the United States.

### I. NATURE OF THE CASE

1. On December 15, 2017, the following Defendants were employed as agents with the Federal Bureau of Investigation ("FBI"): Charles B. Koger ("Agent Koger"), Wesley Ashton Lewis, III ("Agent Lewis"); John Doe ("Agent John"), and Jane Doe ("Agent Jane") (collectively "FBI Defendants").

2. The case arises from a scheme devised by the FBI Defendants to use excessive force to execute an arrest warrant for Dodge issued on December 14, 2017, after his indictment for his alleged deprivation of the civil rights of two individuals in his capacity of Deputy Chief of the Saint Martinville Police Department ('SMPD").

3. Agent Koger was the lead agent who was assisted in the investigation of Dodge and other officers by Agent Lewis, other agents, along with various prosecutors of the United States Attorney's Office for the Western District of Louisiana. The investigation involved conducting interviews with officers of the SMPD regarding incidents related to the arrest of Kenny Batiste ("aka Magoo") in January of 2016, and Curtis Ozenne ("Ozenne") in August of 2016.

4. Agent Koger and Agent Lewis were accused of using intimidation and other coercive tactics during interviews to pressure officers of the SMPD to implicate Dodge. For example, Christian Feller was a reserve detective ("Det. Feller") with the SMPD. Det. Feller was initially contacted by Agent Koger to schedule an interview. They arranged to have the interview at Det. Feller's business and Det. Feller advised Agent Koger to bring a copy of his police report for the

Magoo arrest. When Agent Koger arrived for the interview, he did not have the police report, so Det. Feller canceled the interview. This upset Agent Koger, and he told Det. Feller, "you don't need to be afraid of me just because I'm the FBI." Det. Feller laughed and advised Agent Koger that "he has been putting on his pants the same way as him (Agent Koger), but that he (Det. Feller) had been doing it longer." Agent Koger retorted, "that he was the lead investigator for another case of this type in the area" and believed that "all police officers in south Louisiana are corrupt." He told Det. Feller that he would be hearing from him again and warned that lying to the FBI is a federal offense with a ten year maximum term of imprisonment.

5.   On August 9, 2017, Det. Feller was subpoenaed to testify before the grand jury about the arrest of Magoo in January of 2016. Det. Feller vindicated Dodge testifying that his conduct was consistent with policy procedure and policy. Det. Feller was subpoenaed to testify for Dodge at trial. However, Det. Feller was warned that if he testified for Dodge, he would be prosecuted for perjury. Dodge was acquitted on all charges related to the Magoo.

6.   SMPD Detective Troy LeBlanc ("Det. LeBlanc") was also interviewed on several occasions. He did not implicate Dodge in the matter concerning Magoo, but was called to testify before the grand jury. Afterward, Det. LeBlanc was sent a "Target Letter" stating that he was a person of interest in the case. Other interviews with Agents Koger and Lewis occurred, and Det. LeBlanc tried to negotiate a deal to avoid prosecution for using an unauthorized choke hold to restrain Ozenne when he was arrested by Dodge in August 2016. Det. LeBlanc was charged with "misprision" for not providing information he knew about Dodge. On December 13, 2017, Det. LeBlanc testified again before the grand jury. This time he testified consistent with his statements that Agents Koger and Lewis reported he gave in his pre-grand jury interview Significantly, He also testified that Dodge searched Facebook for information about Agent Koger and his family. Det. LeBlanc testified at Dodge's trial, and Dodge was convicted of the offenses related to Ozenne's arrest and for falsifying related police reports.

7.   The Indictment was returned on December 14, 2017. Agent Koger applied for an arrest warrant that was issued the same day. The next morning, December 15, 2017, the FBI Defendants met to devise a scheme to arrest Dodge. Instead of arresting Dodge at his home, Agent Koger decided to arrest Dodge away from his home; the FBI Defendants surreptitiously watched Dodge's residence. They knew from their investigation that Dodge's regular routine was to leave his home at around 5:00 a.m. to manage his construction business.

8.   At about 5:00 a.m., Dodge exited his home, entered his black 4-door Ford F-250 Truck, and drove to Breaux Bridge, Louisiana to meet with an employee. He was unaware the FBI Defendants were following him. Between 5:30 a.m. and 6:00 a.m., Dodge parked his truck in the parking lot of the Foti's Fruit Stand. As Dodge waited for his employee, he noticed in the rear and side view mirrors several individuals rapidly approaching from the behind. As they got closer, Dodge saw that there were three (3) men and one (1) woman dressed in jackets marked "FBI". Dodge was both relieved and concerned, because as a former Deputy Police Chief, he noticed they were approaching in a "felony arrest formation."

9. Agents Koger and Lewis approached on the driver's side of the truck, as Agents John and Jane approached on the passenger's side. Each of the FBI Defendants had their weapons drawn. As Agents John proceeded to the front fender side of the truck, and Jane stopped beside the passenger door; they both targeted their weapons on Dodge. Agent Jane yelled "FBI", told Dodge to "put his hands on the steering wheel" and that he was "under arrest." Agent Jane did not tell Dodge to exit the truck with his hands-up; Instead, Agent Koger holstered his weapon, stepped onto the running board on the driver's side of the truck, grabbed Dodge by his left-arm and snatched him out of the truck toward the ground. Dodge was able to keep from falling. Agent Lewis had holstered his weapon to assist Agent Koger in handling Dodge. Together, they slammed Dodge into the rear door of the truck. Agent Lewis grabbed Dodge's left-arm, and Agent Koger grabbed Dodge's right wrist. As they put Dodge's hands behind his back, Agent Koger twisted Dodge's right wrist and pressed it into his mid-back with enough force to cause Dodge excruciating pain, prompting him to tell Koger that he did not have to be so rough.

10. They handcuffed Dodge, then took him to a Black Ford F-150 truck and placed him in the back handcuffed. As they did this all of the FBI Defendants laughed in amusement at what was happening. When Dodge asked if the handcuffs could be placed in the front, Agent Koger said, "no" and stated, "remember what I told you, I'm the police."

11. Throughout this ordeal, Dodge complied with Agent Jane Doe's instructions. After Agent Koger snatched him from the truck, Dodge constantly yelled that Agents Koger and Lewis were hurting him. Agents Jane and John Doe both heard Dodge and witnessed with occurred, but they took no steps to stop Koger and Lewis; rather, Agent John told Dodge, "now you know how the people you arrested felt." Agent Lewis jokingly said, "you are a dangerous criminal; we know what you were capable of doing."

12. As the FBI Defendants drove Dodge to the FBI Office in Lafayette, he continuously requested medical treatment for the pain in his right wrist. The FBI Defendants ignored Dodge's request in order to conceal their actions of excessive force, knowing that affording Dodge medical assistance would create a record of his injuries and reveal their misconduct. Upon arriving at the FBI Office, the FBI Defendants put the handcuffs in front of Dodge, but shackled his feet before escorting him into the building to the interview holding area. This is the way Dodge should have been restrained, and was clearly done to conceal the FBI Defendant's misconduct. Inside, Dodge requested medical attention for the pain he experienced, but was still ignored. When he refused an interview, Dodge was taken to the federal building, where he was processed by U.S. Marshal deputies. There, Dodge again requested medical attention for the pain and was told he would receive it when he arrived at the Lafayette Parish Correctional Center ("LPCC") for detention pending his arraignment.

13. During his intake medical screening at LPCC, Dodge advised the nurse that his right wrist was in pain. Again, Dodge's was not examined or given pain medication. During the three days he was confined at LPCC, Dodge did not receive pain medication or an exam of his wrist.

14. On December 18, 2017, Dodge was released on bond. He returned to his business obligations and used over-the-counter pain medication. He sensed something was wrong with his right wrist, but at the time, Dodge had no health insurance. After he saved enough money to "self-pay" -- Dodge arranged for an orthopedic exam to discover the nature of his injury. On May 7, 2018, Dodge was examined by Dr. Robby LeBlanc, who advised Dodge that his Dodge's '[r]ight wrist [was] displaced [by] fracture of [the] proximal third scaphoid bone with non-union []," and "radiographic findings [indicated this injury was] consistent with the reported date of injury in 12/2017." Ex. D @ 2. Dr. LeBlanc explained that the 'proximal pole fractures are more likely to develop non-union because of the blood supply ..." and "that there [was] the possibility of developing avascular necrosis of the proximal pole as well." Id. The doctor 'recommend[ed] an MRI of the right wrist to evaluate for avascular necrosis that can potentially change the type of surgical management." Id. Dodge was scheduled for a post-MRI exam. Id.

15. Subsequently, Dodge had Open Reduction Internal Flexion ("ORIF") surgery of the right scaphoid (i.e. the bone on the thumb side of other small bones in the wrist) fracture, which included the use of prominent hardware (i.e. two screws) and a bone graft designed to correct the fracture. see Ex. E @ 1-2. After he was incarcerated, Dodge had another orthopedic exam and discovered that the ORIF surgery was unsuccessful in grafting his wrist fracture. Id. @ 2. The exam was done by Dr. Aldridge Mack, III, at the Triangle Orthopaedic Clinic and revealed that one third of Dodge's right proximal pole scaphoid (i.e. the central bone in the wrist) was still fractured despite the prominent hardware used to promote grafting along with evidence of avascular necrosis (a disease resulting from the lost of blood supply to the bones). see Orthoinfo; https://orthoinfo.aaos.or/en/diseases--conditions /avascular necrosis. To date, Dodge has had no corrective surgery and continues to experience pain, discomfort, and a limited range of motion ("ROM") as a result of the excessive force used by FBI Defendants to arrest him on December 15, 2017. The limited ROM of the right wrist also affects his ability to earn income and to enjoy leisure use of his right hand in the future. Id.

16. The pain, discomfort, and limited ROM related to Dodge's right wrist injury is the direct result of the unreasonable excessive force Agents Koger and Lewis used to arrest him. The FBI Defendants and health care staff at LPCC, were deliberately indifferent to Dodge's request for pain management treatment and an exam. Dodge did not know the nature of his wrist injury until his orthopedic exam on May 7, 2018. Afterward, he filed an undated tort claim with the Department of Justice ('DOJ"), Office of the Inspector General ("OIG") contending the FBI Defendants used excessive force to arrest him. see Ex. A @ 1-2; Ex. B. The OIG reviewed Dodge's claim and determined that the matters ... raised [were] more appropriate for review by another office within the DOJ ...." and forwarded [Dodge's] [claim] to:" Federal Bureau of Investigation/ Inspection Division/935 Pennsylvania Avenue N.W./Washington, DC 20535. see Ex. B.

17. That OIG response is dated November 6, 2019, and indicates that Dodge's tort claim was submitted within two years of the December 15, 2017, incident (May 7, 2018 is the accrual date under the "Discovery Rule"). In effect, the OIG constructively filed Dodge's administrative

tort claim, when on November 6, 2019, it forwarded the claim to the FBI. see 28 CFR Sec. 14.2(b)(1).

18. On July 17, 2020, the FBI responded to Dodge's claim and acknowledged the claim was forwarded by the OIG "for review and appropriate handling ...," yet concluded that because the "matter has already been reviewed by the [OIG], [the FBI] [would] take no further action in this matter." Ex. C.

19. That response by the FBI is inconsistent with the statutory requirements under 28 U.S.C. Sec. 2401(b) that requires a "final decision of the claim by the agency ... be mailed to [Dodge] by certified or registered mail." 28 U.S.C. Sec. 2401(b). Moreover, because the OIG forwarded Dodge's claim to the FBI on November 6, 2019 under 28 U.S.C. Sec. 2675(a) the July 17, 2020 disposition was untimely because it exceeded the six month period to issue notice of its final disposition to Dodge. This gave Dodge the "option" to deem the July 17, 2020 response by the FBI as a final denial for purposes of filing the instant tort claim at "anytime thereafter." 28 U.S.C. Sec. 2675(a)("the failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of claimant anytime thereafter, be deemed a final denial of the claim for purposes of this section."); see also 28 CFR Sec. 14.9(a).

20. On December 29, 2020, Dodge filed for reconsideration of his Tort Claim with the FBI. see Ex. G. He again argued that due to the excessive force used to arrest him, he sustained a severe and chronic wrist injury that required corrective surgery, and still requires additional surgical treatment. He included a sum of a certain amount for damages of $2,000,000 due to his injuries, medical costs, and future disability. Id.

21. On April 20, 2021, the FBI, via certified mail, sent Dodge notice of its final disposition denying his administrative tort claim, and advising that if he was dissatisfied he could file the instant suit in the court not later than six months after the date of mailing of its notification, which equates due date by October 21, 2021. see Ex. G.

22. This timely federal tort claim seeks adjudication of Dodge's claims on the merits and an award for damages in the amount of $2,000,000.

## II. JURISDICTION AND VENUE

23. This Court has exclusive jurisdiction under 28 U.S.C. Sections 1346(b)(1), 1402(b), 2401(b), and 2671-2680 under the FTCA.

24. Venue is proper, pursuant to 18 U.S.C. Section 1391(b)(2), because a substantial part of the events giving rise to the claim occurred in the Western District of Louisiana.

## III. PARTIES

25. Codi Dodge is the Plaintiff in this case and at all times relevant to this action was investigated by the FBI. The investigation pertained to Dodge's alleged violations of the civil rights of two individuals while acting under color of state law as the Deputy Chief of the SMPD, and related offenses alleged to cover-up his criminal actions. On December 15, 2017, the date of the incident giving rise to this action, Dodge had resigned his former position as Deputy Chief, and was the owner and operator of a construction business.

26. Charles B. Koger is a Defendant in this case and at all the times relevant to this action was a law enforcement agent employed by the FBI, Lafayette Office. Agent Koger was the "lead agent" responsible for directing the investigation into alleged civil rights violation and the concealment of the same by Dodge and other officers of the SMPD. Agent Koger also attested to the facts in support of an arrest warrant for Dodge and on December 15, 2017, Agent Koger used excessive force to arrest Dodge that seriously injured his right wrist.

27. Wesley Ashton Lewis, III, is a Defendant in this case and at all times relevant to this action was a law enforcement agent employed by the FBI, Lafayette Office. Agent Lewis was responsible for investigating criminal complaints alleging Dodge and other officers at the SMPD violated individuals' civil rights and concealed the same. On December 15, 2017, Agent Lewis used excessive force to execute the arrest warrant for Dodge and seriously injured his right wrist.

28. John Doe is an unidentified Defendant in this case and at all times related to this action was a law enforcement agent employed by the FBI, Lafayette Office. Agent John Doe participated in Dodge's arrest on December 15, 2017, and observed the excessive force used by Agents Koger and Lewis to arrest Dodge. Agent John Doe did nothing to stop those agents, but instead encouraged them.

29. Jane Doe is an unidentified Defendant in this case and at all times relevant to this action of was a law enforcement agent employed by the FBI, Lafayette Office. Agent Jane Doe participated in Dodge's arrest on December 15, 2017 and observed the excessive force used by Agents Koger and Lewis to arrest Dodge; she did nothing to stop them, but instead encouraged them.

30. The United States is a Defendant in this action, and pursuant to 28 U.S.C. Sections 1346(a), and 2679(b)(1), assumes liability for the wrongful act of excessive force used on December 15, 2017, by FBI Agents Koger and Lewis to arrest Dodge, and the omissions of bystanders Agents John and Jane Doe to prevent that act of excessive force, where those actions caused the injuries to Dodge's right wrist.

## IV. CAUSE OF ACTION

(A). Excessive Force Claim:

31. In late 2016, Dodge was Deputy Chief of Detectives with the SMPD. He became the subject of a federal investigation led by Agent Koger for suspected civil rights and obstruction of justice offenses. As part of that investigation, several officers and employees at the SMPD were interviewed by Agents Koger and Lewis along with other agents and members of the prosecution team. In December 2016, Dodge retired from the SMPD to start his own construction business. Dodge remained under investigation and he noticed that occasionally he was being watched by agents while at home and at various times of the day.

32. On December 14, 2017, a federal grand jury returned an Indictment only against Dodge and charged civil rights and obstruction of justice violations. Agent Koger applied for an arrest warrant for Dodge that was issued that same day. As lead investigator, Agent Koger devised the plan to execute the arrest warrant.

33. At that time, Agents Koger and Lewis had conducted numerous interviews with detectives, officers, and the Chief of the SMPD. The FBI Defendants knew, (1) that Dodge retired in December 2016, after over thirteen (13) years of service as a law enforcement officer, (2) was no longer acting under the color of state law, (3) had no criminal record, (4) was married with three daughters, (5) active in community youth development (soccer coach), and (6) had started his own construction business.

34. Additionally, between Dodge's retirement in December 2016 up to when the arrest warrant issued on December 14, 2017, the FBI Defendants watched Dodge and knew his regular work schedule involved leaving home early in the morning and returning home late in the evenings. They also knew that Dodge drove a black 4-door Ford F-250 truck. Moreover, there had been no new complaints filed against Dodge with law enforcement, nor had Dodge ever been disciplined as a law enforcement officer for misconduct of any kind. They also knew that Dodge still coached the local youth soccer team and that he had plenty of community support.

35. By inference, any reasonable officer with knowledge of these facts, (1) would not believe Dodge posed a threat to them or others, and (2) could reasonably conclude the arrest warrant could be executed simply by arresting Dodge at home. Agent Koger's decision to use a felony arrest tactic to arrest Dodge was unreasonable and beyond what was needed to facilitate Dodge's arrest. There is evidence that Agent Koger had a vendetta. His one interview with Dodge devolved to an argument over whether local or federal law enforcement were the "real police." Subsequently, Agent Koger learned during an interview with Det. LeBlanc that Dodge had searched on facebook for information on where Agent Koger and his family resided. In other words, Dodge was investigating him.

36. Early on the morning of December 15, 2017, FBI Agents Koger, Lewis, John Doe, and Jane Doe watched Dodge as he exited his house at about 5:00 a.m. Rather than arrest Dodge, as planned, the FBI Defendants followed Dodge as he drove away from his home in his Ford F-250 truck to meet an employee in the parking lot of Foti's Fruit Stand ("Foti's") in Breaux

Bridge, Louisiana. Between about 5:30 a.m. to 6:00 a.m., Dodge parked his truck at Foti's and waited for his employee to arrive. Agent Koger decided this was an ideal place to execute the plan he devised to arrest Dodge.

37. Dodge observed in the rear and side view mirrors of his truck three (3) males and one (1) female wearing attire marked FBI approaching his truck from behind in a "felony arrest formation." Dodge recognized Agents Koger and Lewis; they approached on the driver's side. He also noticed the other two agents were approaching on the passenger side. Con-sistent with a felony arrest formation all the agents had their weapons drawn.

38. As the FBI Defendant reached the truck, FBI Agent John Doe positioned at the front right fender of the truck, as Agent Jane Doe positioned parallel to the passenger's door. Both these agents had their weapons targeting Dodge. Agent Jane yelled, "FBI" -- then told Dodge to slowly place his hands on the steering wheel, and that he was under arrest. Dodge complied with each of those commands.

39. Agent Koger was still on the driver's side. He holstered his weapon, stepped onto the running board of the truck, and Agent Lewis holstered his weapon then advanced closer to assist Koger. Agent Koger then opened the truck door, grabbed Dodge and physically snatched him from the truck. As this occurred, Agents John and Jane Doe had re-positioned themselves to cover Agents Koger and Lewis.

40. Dodge fell from the truck toward ground, but kept his footing. Together, agents Koger and Lewis slammed Dodge into the rear door of the truck. They both continued to handle Dodge. Agent Lewis took hold of Dodge's left arm, as Agent Koger grabbed Dodge's right wrist. Together, both agents put Dodges' hands behind his back, but Agent Koger pushed Dodge's right wrist inward on an angle causing Dodge excruciating pain and to tell Koger that he did not need to be so rough. Unfazed, Agent Koger increased the pressure as he and Lewis placed Dodge in handcuffs, then hauled him to a black Ford F-150 pick-up, and placed him in the back with his hands still cuffed behind him. These conditions further exacerbated Dodge's pain and injury he would later discover.

41. Throughout this incident, Agents John and Jane Doe did nothing to stop the excessive force exhibited by Agents Koger and Lewis. Instead, those agents sanctioned that conduct, and told Dodge that now he was able to know how people he arrested felt. All of the FBI Defendants laughed when Dodge requested medical treatment.

42. As Dodge was transported to the FBI Office, he constantly complained that he was in pain and needed medical attention. His complaints were ignored. Upon arriving at the FBI Office, Dodge was taken from the truck, his hands were cuffed-in-front, his feet were shackled, then he was escorted into the building to the arrestee interview area. After he requested counsel and refused to be interviewed, Dodge was transported to the LPCC.

43. As he was medically screened at the LPCC, Dodge told the intake screening nurse about the incident and that he was in horrible pain. Dodge did not receive any medical treatment for pain or an exam for diagnostics purposes over the three (3) days he was detained at LPCC.

44. On December 18, 2017, Dodge was released on bond. On May 7, 2018, he was examined by Dr. Robby LeBlanc at the Louisiana Orthopaedic Specialist Clinic, and diagnosed with a right wrist fracture that required an MRI to determine treatment options. Ex. D @ 2.

45. The MRI was conducted on May 9, 2018 at LOS and revealed a "subacute to chronic proximal scaphoid pole fracture without solid osseous bridging, mild sclerosis, and cystic change on both sides of the fracture plane raising the possibility of early AVN [avascular necrosis -- a disease from loss of blood supply to the bones]." Ex. D 2 5. This diagnosis translates to a 'subacute right proximal pole scaphoid fracture without definitive AVN ...." or "evidence of posttraumatic arthritis at the proximal scaphoid or distal radius." Id. Dr. LeBlanc concluded that "[t]he findings on the x-rays and now an MRI are consistent with the reported time frame regarding the right wrist injury in 12/2107." Id. Simply put, Dodge's right wrist was fractured and Dr. LeBlanc wanted additional imagining of the injury.

46. The diagnostics of Dodge's right wrist fracture clearly indicates that the excessive force used by FBI Agents Koger and Lewis is the proximate cause of that injury. Dodge's wrist injury has been surgically treated but still requires additional surgical treatment to facilitate bond grafting of his wrist fracture. see Exhs. D @ 7, E @ 1-2.

47. The use of force by agents Koger and Lewis was objectively unreasonable. Dodge was a retired police officer with thirteen (13) years experience including serving as a Deputy Chief. He had no prior criminal record. The FBI Defendants could have arrested Dodge at his house, so there was no need to watch Dodge leave his house at 5:00 a.m., then follow Dodge to a secluded location, the parking lot of Foti's, to execute the arrest warrant using a felony arrest tactic. These facts infer the arrest was planned using information obtained during the investigation regarding Dodge's regular work itinerary, and executed away from Dodge's residence at a time and place with limited or no witnesses.

48. FBI Agents John and Jane Doe were the first agents to approach Dodge, tell him he was under arrest, and to place his hands on the steering wheel of the truck. Dodge complied with their orders and could have been easily instructed to just exit his truck, where he could have been arrested and handcuffed without incident. Instead, these agents acted in accord with the plan devised by lead Agent Koger, which included allowing him to be the arresting officer to handcuff Dodge. The FBI Defendants knew that Dodge had reportedly used Facebook to discover where Agent Koger and family lived and that Agent Koger had a vendetta to show Dodge that he was the "real police."

49. The FBI Defendants were employees of the federal government working for the FBI, a federal agency that is part of the Department of Justice. see 28 Department Sections 531, and

2671. At the time of the incident out of which this claim arose, the FBI Defendants were acting within the scope of their employment. see 2679(d)(1). Therefore, upon certification by the Attorney General of the United States, the named and unidentified FBI Defendants will be dismissed from this action and the United States substituted as Defendant under governance of the FTCA. Id.; see also Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 420 (1995).

50. Under Louisiana law, "the use of excessive force constitutes a battery." Moore v. LaSalle Corr. Inc., 2020 U.S. Dist. LEXIS 203208 (W.D. La. October 30, 2020)(citing Ross v. Sheriff of Lafourche Parish, 479 So. 2d 506, 511 (La. App. 1 Cir. 1985)("Although Branigham acted under color of legal authority in assisting in Plaintiff's arrest, he used excessive force in restraining the prisoner in violation of LSA-C. Cr.P. art. 220 by unnecessarily choking Plaintiff. Such force transforms ordinary protected use of force into an actionable battery, rendering the defendant officer and his employer liable for damages."); see also Kyle v. City of New Orleans, 353 So. 2d 969 (La. 1977); Newman v. Guedey, 703 F.3d 757, 762-63 (CA 5, 2012). Because excessive force is battery in Louisiana, it is a proper cause of action in this case. Id.

51. Dodge had a Fourth Amended right against unreasonable search and seizure, which encompasses the plain right to be free from the use of excessive force in the course of an arrest. See Graham v. Connor, 490 U.S. 386, 394-95 (1989).

52. There was no need for the application of force, where, as noted above, (1) Dodge had no criminal record,(2) was a retired after serving in law enforcement for thirteen years, (3) was an active member in community youth development, (4) could have been arrested at his home on the date of the incident, (5) left his home on that date at 5:00 a.m. for what FBI Agents knew was his regular course of business, and (6) he was fully compliant when instructed to put his hand on the steering wheel, and that the he was under arrest.

53. As a result of the agents unreasonable excessive force Dodge sustained a serious wrist fracture that required ORIF orthopedic surgery and necessitates additional corrective surgery because the fracture in his wrist has not fully grafted, thus remains fractured with the development of AVN.

## CONCLUSION

WHEREFORE, for the reasons above, Plaintiff respectfully demands a jury trial in this matter, after the period of discovery normally scheduled by the Court in matters involving the instant claims.

Dated:_____

/s/ Codi Dodge

_____
Codi Dodge #20396-035
Plaintiff/Pro-se
FCI Butner Low

9